**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| SCOTT SAUVAGEAU, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 24-40036-MRG** |
| FRANK BISIGNANO[1] | ) | |
| Commissioner of Social Security Administration, | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

**August 14, 2025**

The Plaintiff, Scott Sauvageau, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying his Disability Insurance Benefits ("DIB"), or, in the alternative, remand to the Administrative Law Judge ("ALJ"). (Docket #8, #12). The Commissioner seeks an order affirming his decision. (Docket #10).

By Order of Reference dated May 2, 2025, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #16), this matter was referred to me for a Report and Recommendation on these two motions which are now ripe for adjudication.

For the reasons that follow, I RECOMMEND that Sauvageau's Motion to Remand (Docket #12) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket #10) be ALLOWED.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Frank Bisignano is substituted as the defendant in this matter.

I.      BACKGROUND

A.      Procedural History

Sauvageau filed an application for DIB on April 28, 2020, alleging a disability onset date of January 1, 2019.[2]  (Tr. 336).  The application was denied initially on July 3, 2020, and again on reconsideration on August 24, 2020.  (Tr. 142-44, 147-49).  The ALJ held an initial hearing on February 9, 2021, followed by a supplemental hearing on April 14, 2021, due to audio issues with the first hearing.  (Tr. 117).  The ALJ rendered a decision unfavorable to Sauvageau on June 18, 2021.  (Tr. 114-35).  On June 27, 2022, the Appeals Council vacated the ALJ's decision and remanded for rehearing because of audio issues with the 2021 hearings.  (Tr. 138-39).  The ALJ held a new hearing on September 21, 2022 (Tr. 36-89), before rendering another decision unfavorable to Sauvageau on February 22, 2023.  (Tr. 14-35).  The ALJ found that Sauvageau was not disabled from January 1, 2019, through March 31, 2019, Sauvageau's date last insured.  (Tr. 29-30).  The Appeals Council denied Sauvageau's request for administrative review on January 10, 2024, at which point the ALJ's decision became final and ripe for judicial review.  (Tr. 1-6).

Sauvageau filed a complaint with this Court on March 7, 2024, pursuant to 42 U.S.C. § 405(g).  (Docket #1).  The Commissioner filed a motion for an order affirming his decision on December 23, 2024.  (Docket #10).  Sauvageau then filed a motion to remand on January 30, 2025.  (Docket #12).  The Commissioner filed a response to Sauvageau's motion on February 5, 2025.  (Docket #15).

---

[2] Sauvageau initially alleged a disability onset date of July 1, 2019, but, because he had not accumulated enough credits to be entitled to disability benefits on that date, the field office created an arbitrary onset date of March 31, 2019, which "is essentially the same as the date last insured."  (Tr. 38-39).

B.    Personal History

Sauvageau was forty-two years old at the time he claims he became disabled.  (Tr. 336). Sauvageau is a high school graduate.  (Tr. 46).  He is married with one child and has a driver's license.  (Tr. 336-37, 477).  Through the date last insured, Sauvageau was living at home with his wife, and their daughter was in the custody of Sauvageau's mother because of an ongoing Department of Children and Families ("DCF") case.  (See Tr. 59).

Sauvageau operated his own plumbing business from 2013, (Tr. 461), until its closing on January 2, 2019, (Tr. 52-53).  Sauvageau testified that he closed the business because his functioning "took a turn for the worst."  (Tr. 53).  Sauvageau has previously worked as an apprentice plumber, hand-nailer, groundskeeper, maintenance engineer, and warehouse worker. (Tr. 46-47, 49-51, 466).  Sauvageau testified that he had been fired from some of his previous jobs because he did not get along with his bosses.  (Tr. 55-56).

C.    Medical History

In late 2014, Sauvageau began experiencing neck and arm pain and was diagnosed with cervical radiculopathy.  (Tr. 577-78).  On January 14, 2015, Dr. James Celestin, an orthopedic surgeon, described Sauvageau's pain as "sharpshooting spasms in the neck" and "quite severe." (Tr. 578).  Sauvageau was being prescribed opiates at the time for the pain.  (Id.).  During a follow-up on April 28, 2015, Dr. Celestin noted Sauvageau's condition improved following treatment which consisted of a cervical epidural injection and a cervical medial branch block.  (Id.).

On May 26, 2015, Sauvageau saw a psychiatrist, Dr. Paul Epstein, and reported that he was doing well outside of his recurring neck pain.  (Tr. 561).  Dr. Epstein summarized Sauvageau's history of dysfunctional behavior which led to several hospitalizations dating to 2001.  (Id.).  Dr. Epstein attributed this behavior to Sauvageau's significant substance use in his adolescence and

early twenties, which included heavy inhalant use. (Id.). Dr. Epstein explained how the drug use had a substantial impact on Sauvageau's cognition and left him grossly disordered and paranoid for years. (Id.). However, Sauvageau made a "substantial turn around" in 2008, with Dr. Epstein noting no evidence of delusional ideation or grossly dysfunctional behavior since then with Sauvageau taking Cymbalta. (Id.). Sauvageau reported that his plumbing business was "thriving" and that he was satisfied with the direction his life had taken. (Id.). Dr. Epstein noted Sauvageau showed no signs of depression. (Id.). Dr. Epstein found that Sauvageau had intact thought process with no psychotic elements or delusional ideation. (Id.). He described Sauvageau's judgment as reasonably good and his insight as fair; Sauvageau's mood was described as "great," appropriate and amiable. (Id.). Dr. Epstein assessed Sauvageau's adaptive function with a Global Assessment Functioning (GAF) score "in the 80 range."[3] (Tr. 562).

On May 26, 2016, Sauvageau was seen for a physical by his treating physician, Dr. Agnieszka Snioch. (Tr. 591). Dr. Snioch noted that Sauvageau had no complaints of anxiety, depression, or lack of enjoyment. (Id.). Dr. Snioch also noted that Sauvageau was still taking opiates for his neck pain, and that he was hesitant to lower his dosage. (Tr. 592).

On May 8, 2018, Sauvageau had an initial visit with Dr. Christopher Kennedy for a psychiatric evaluation and discussion about managing his medications. (Tr. 621). In a letter to Dr. Snioch, Dr. Kennedy noted that Sauvageau complained of "severe problems with distractibility, inability to sustain attention, and inability to multitask." (Id.). Sauvageau was not comfortable speaking on the phone and had trouble in social interactions. (Id.). Dr. Kennedy surmised that

---

[3] The GAF Scale is used for reporting a clinician's judgment of the individual's overall level of functioning and concerns psychological, social, and occupational functioning. See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-33 (4th ed., text revision 2000) ("DSM-IV-TR"). However, the GAF scale was not included in the DSM-V for several reasons, including its conceptual lack of clarity. See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM-V"). GAF scores in the 81-90 range indicates absent or minimal symptoms, good functioning in all areas, involvement in a wide range of activities, social effectiveness, general satisfaction with life, and no more than everyday problems or concerns. See DSM-IV-TR at 34.

Sauvageau had "combined type [Attention Deficit Hyperactivity Disorder ('ADHD')]," "polysubstance use disorder in remission," and met the criteria for social anxiety disorder. (Id.).

On July 5, 2018, Sauvageau had a physical with Dr. Snioch where he explained that he was feeling depressed and had little interest in doing things. (Tr. 624). At this time, Sauvageau had stopped taking opiates and understood that he had been addicted to them. (Tr. 626). Sauvageau reported that his neck pain did not get any worse after stopping the pain medication. (Id.).

In August 2018, Sauvageau's treating psychiatrist, Dr. Kennedy, noted that Sauvageau had difficulty finishing thoughts and explaining himself. (Tr. 686). Dr. Kennedy also noted that Sauvageau was experiencing hallucinations, delusions, and a psychotic thought process. (Id.). Sauvageau's therapist, Dr. Paul Shiebler, noted in August and September 2018 psychotic biblical thinking, with Sauvageau associating bad thoughts with themes from the Bible, such as the "Serpent of Eden." (Tr. 703-07).

On September 24, 2018, Sauvageau's wife gave birth to his daughter. (Tr. 637). His wife had pneumonia at the time, lost a substantial amount of blood during the birth, and required three blood transfusions. (Tr. 637, 793). By the time his daughter was born, Sauvageau reportedly had not slept or taken his antipsychotic medication in over twenty-four hours. (Tr. 793). He tried to remove his daughter from the hospital, concerned that medical providers were not properly caring for her. (Id.). Hospital staff prevented Sauvageau's attempt, and the baby was subsequently placed in DCF custody and put in the care of her grandmother. (Id.). A week after the incident, Dr. Shiebler, wrote a letter to DCF detailing Sauvageau's condition at the time of the incident. (Tr. 719). Dr. Shiebler attributed Sauvageau's psychotic behavior to his severe lack of sleep, the stressful birth of his daughter, and the effects of forgetting to take his psychiatric medication. (Id.).

Treatment notes before and after the incident indicated significant progress with medication and psychotherapy. (<u>See</u>, <u>e.g.</u>, Tr. 683-84). Just before the incident, Dr. Kennedy noted "significantly improved attention and overall function" and fewer "internal distractions." (Tr. 684). About a month after the birth, Dr. Kennedy found Sauvageau showed "significant improvement of clarity of thought" and that Sauvageau was able to "express self reasonably clearly." (Tr. 681).

In December 2018, the month before the alleged onset date, Dr. Kennedy noted that Sauvageau demonstrated no significant paranoia and had more coherent thoughts. (Tr. 678). Sauvageau was also "getting some [plumbing] calls and doing some work." (<u>Id.</u>).

In January 2019, shortly after the alleged onset date, Dr. Kennedy explained that Sauvageau was doing very well despite being "a little guarded [because of] DCF concerns." (Tr. 675). Dr. Kennedy also noted that there was no significant depression and that Sauvageau had good anxiety management. (Tr. 676). A month later, Dr. Kennedy noted Sauvageau had "[g]ood control of psychosis, attention, and mood symptoms." (Tr. 674). However, Dr. Kennedy noted during this February 2019 visit that the DCF case did make Sauvageau anxious. (<u>Id.</u>). In March 2019, just before the date last insured ("DLI"), Dr. Kennedy observed no evidence of psychotic symptoms and that Sauvageau had "reasonable control of his anxiety." (Tr. 673).

In April 2019, just after the period at issue, Sauvageau stated that his plumbing business was doing well and that he was doing well with his mood and taking his medications properly. (Tr. 672). Dr. Kennedy's mental status examinations revealed a normal thought process; intact associations; no suicidal ideation or hallucinations; that Sauvageau was oriented to time, place, and event; and that his insight and judgment were intact. (<u>Id.</u>).

In July 2019, more than three months after the March 31, 2019 DLI, Dr. Kennedy again described Sauvageau as alert and oriented, with normal thought process and no delusions. (Tr. 670). Sauvageau reportedly did not have much anxiety and was staying organized and paying attention. (Id.). Although Dr. Shiebler noted that Sauvageau had problems with his neighbors at this point, he did not report whether these problems were due to psychotic thinking. (Tr. 732).

On April 14, 2020, almost a year after the DLI, Dr. Shiebler's notes reveal that Sauvageau was having "magical thinking" and thought the census was evil. (Tr. 740). On June 18, 2020, Dr. Shiebler noted that Sauvageau's paranoia had worsened. (Tr. 743). On July 14, 2020, Sauvageau reported continued problems with his neighbors, saying that they were eavesdropping and looking at his yard. (Id.). On September 9, 2020, there was "much paranoia," and again Sauvageau reporting his neighbors were spying on him. (Tr. 745). Sauvageau thought his mail was being opened and that he should get the FBI involved. (Id.). In October 2020, Sauvageau told Dr. Shiebler that there were planes watching his house and his mail was being opened. (Tr. 746). On June 7, 2022, Dr. Kennedy noted that Sauvageau was still suffering severely from paranoia, which forced him to stay indoors and left him angry and frustrated. (Tr. 779).

D.    Medical Opinions

1.    State Agency Opinions

On June 29, 2020, at the initial level, Dr. Lois Condie, state agency psychological consultant, reviewed the evidence on record and conducted a mental residual functional capacity ("RFC") assessment. (Tr. 96-99). Dr. Condie stated that Sauvageau's schizoaffective disorders and ADHD both constituted severe impairments. (Tr. 96). Dr. Condie assessed that Sauvageau had mild difficulties in understanding, remembering, or applying information; moderate difficulties in interacting with others; moderate difficulties in concentrating, persisting, or

maintaining pace; and mild difficulties in adapting or managing oneself. (Id.). Dr. Condie found that Sauvageau was able to maintain attention, concentration, persistence, and pace for routine tasks, for two hours at a time during a normal workday/week. (Tr. 98). Dr. Condie also stated that Sauvageau was able to tolerate the minimum social demands of simple task-setting. (Tr. 99). Finally, Dr. Condie concluded that Sauvageau was able to tolerate simple changes in routine and avoid hazards, travel independently, and make and carry out simple plans. (Id.).

On August 18, 2020, on reconsideration, Dr. Kenneth Higgins, a state agency psychological consultant, conducted a mental RFC assessment. (Tr. 107-11). Like Dr. Condie, Dr. Higgins found that Sauvageau had mild difficulties in understanding, remembering, or applying information; moderate difficulties in interacting with others; and moderate difficulties in concentrating, persisting, or maintaining pace. (Tr. 107). However, unlike Dr. Condie, Dr. Higgins opined that Sauvageau had moderate difficulties in adapting and managing oneself. (Tr. 108). As had Dr. Condie, Dr. Higgins found that Sauvageau was able to maintain attention, concentration, persistence, and pace for routine tasks, for two hours at a time during a normal workday/week. (Tr. 110).

2. Treating Physician Opinions

On June 26, 2020, Dr. Kennedy completed a summary of Sauvageau's impairments. (Tr. 695-97). Dr. Kennedy noted that Sauvageau was "prone to flares of disorganized thoughts and paranoia," including concerns that his neighbors were targeting him or trying to harass him. (Tr. 695). Sauvageau had trouble with social contact because of anxieties and paranoia but did well with his immediate family. (Id.). Dr. Kennedy also noted that Sauvageau's prescription medication somewhat ameliorated his severe attention and concentration problems. (Id.). According to Dr. Kennedy, Sauvageau's paranoia would keep him from taking criticism well from supervisors. (Tr.

696).  Dr. Kennedy stated that Sauvageau was able to drive but probably would not be able to take public transportation.  (Id.).

On November 24, 2020, Dr. Kennedy provided another assessment of Sauvageau, this time completing a mental RFC assessment.  (Tr. 749-52).  He concluded that Sauvageau's impairments would substantially interfere with his ability to work on a sustained basis at least 20% of the time.  (Tr. 752).  Furthermore, Dr. Kennedy opined that Sauvageau would miss twenty-nine out of thirty workdays per month because of his impairments.  (Id.).  In determining that Sauvageau could not work on a sustained basis, Dr. Kennedy noted that Sauvageau had distracting paranoid thoughts and anxiety prohibiting him from sustaining attention to work-related tasks and was unable to tolerate working with other people.  (Id.).  Dr. Kennedy also noted that Sauvageau had trouble managing his finances and his wife had full control of financial decisions.  (Id.).

On December 10, 2020, Dr. Shiebler provided a mental RFC assessment of Sauvageau's condition.  (Tr. 753-56).  Dr. Shiebler indicated that Sauvageau had mild to moderate limitations in understanding and memory, mild to marked limitations in sustained concentration and persistence, mild to marked limitations in social interaction, and mild to marked limitations in adaptation.  (Tr. 754-56).  Dr. Shiebler assessed Sauvageau with a GAF of 40.[4]  (Tr. 753).  Dr. Shiebler opined that Sauvageau's impairments would prohibit him from working on a regular and sustained basis and noted that Sauvageau had deteriorated since the birth of his daughter.  (Tr. 756).

---

[4] GAF scores in the 31-40 range indicates some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work).  See DSM-IV-TR at 34.

E.    Hearing Testimony

1.    Sauvageau Testimony

Following remand by the Appeals Council, a final hearing before the ALJ was held on September 21, 2022, where Sauvageau, represented by an attorney, gave testimony.[5] (Tr. 38-89). Throughout his testimony, Sauvageau repeated that he had an inability to get along with other people. (Tr. 38-75). He explained how he had been fired from previous jobs because of his difficulty with getting along with coworkers and supervisors. (Tr. 55). Sauvageau testified that his anxiety and overthinking caused him to get lost in thought. (Tr. 54-55). Regarding the operation of his business, Sauvageau testified that he would only take easy jobs and avoided jobs where he would have to interact with people. (Tr. 68-70).

Sauvageau testified that the last time he left his house without his wife was around two years earlier. (Tr. 64-65). On that occasion, Sauvageau explained that he went to Home Depot and the computer there shut down and that it had something to do with him. (Id.). He further testified that the last time he took his mother-in-law to the hospital, the computer there malfunctioned in reaction to him. (Tr. 62-63). He thought that either someone was trying to "screw" with him, or his energy had caused the malfunction. (Id.).

In response to Dr. Kennedy's notes that his condition had improved following the incident with his daughter, Sauvageau testified that he lied about his improvement in order to regain custody of his daughter (following the hospital incident, DCF had placed his daughter with his mother). (Tr. 58-59, 71). Sauvageau testified that while his daughter was living with his mother, he drove independently to her house to see her. (Tr. 72).

---

[5] Testimony was also taken at earlier hearings from Sauvageau and his wife, but due to recording issues were not made part of the administrative record. (Tr. 23). The ALJ noted that Ms. Sauvageau's testimony corroborated her husband's allegations regarding his difficulty dealing with people, his issues with focusing, his psychosis surround the incident with their daughter, and his distractions with more complicated jobs. (Id.).

Sauvageau testified that his neighbors were hacking into his phone and internet and opening his mail.  (Tr. 73-74).  Sauvageau stated that he believed his neighbors were involved with his Social Security claim.   (Tr. 63-64).   Furthermore, he claimed that helicopters and airplanes,called in by a relative, surveilled his house.  (Tr. 74).

2.  Vocational Expert Testimony

In addition to Sauvageau's testimony, the ALJ heard from an impartial vocational expert, Zach Fosberg, at the September 2022 hearing.  (Tr. 75-87).  The ALJ asked Fosberg for his assessment on the skill and exertional levels of Sauvageau's work history.  (Tr. 76-78).  The ALJ then asked Fosberg to consider a hypothetical person who has no exertional limitations but who must avoid extreme temperatures and exposure to unprotected heights; who could focus adequately to perform simple tasks but not fast-paced ones; who could tolerate infrequent changes to tasks; who could not work with the general public or on a team, but who could work occasionally with co-workers and independently without supervision.  (Tr. 78-79).  Fosberg testified that, while such an individual could not perform any of Sauvageau's past jobs, the hypothetical person could perform work as a warehouse worker, consisting of about 3,500 jobs nationally; as a laundry worker, consisting of 20,000 jobs nationally; a price marker, consisting of 130,000 jobs nationally; and a mail sorter, consisting of 25,000 jobs nationally.[6]  (Tr. 79-81).  However, Fosberg testified that one to two absences by such an individual per month on an ongoing basis would preclude the individual's ability to maintain any employment and that the same would be true for someone who arrived late and left early on an ongoing basis.  (Tr. 81).  Fosberg also testified that if the hypothetical person was off task 10% or more during work hours, they would be precluded from maintaining employment in any job.  (Tr. 82).  If the hypothetical individual was unable to work

---

[6] Fosberg clarified that this job would be independent of Sauvageau's past performance as a warehouse worker as actually performed.  (Tr. 79).

around others without causing a distraction or a conflict, Fosberg stated that such an individual would be precluded from maintaining work.  (Tr. 86).

F.    Administrative Decision

In assessing Sauvageau's application for benefits, the ALJ conducted the five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits.  20 C.F.R. § 404.1520; Sacilowski v. Saul, 959 F.3d 431, 433-34 (1st Cir. 2020).  The test is sequential, with each step determining whether the ALJ must move to the next step.  20 C.F.R. § 404.1520(a)(4); Sacilowski, 959 F.3d at 433.

At the first step, the ALJ considers the claimant's work activity and determines whether he is "doing substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is doing substantial gainful activity, the ALJ will find that he is not disabled.  Id.  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R. § 404.1572(a).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized.  20 C.F.R. § 404.1572(b).  The ALJ determined that Sauvageau did not engage in substantial gainful activity from his alleged onset date of January 1, 2019, through the March 31, 2019 DLI.  (Tr. 19).

At the second step, the ALJ determines whether the claimant has a medically determinable impairment or combination of impairments that is "severe" and meets the durational requirement of twelve months.  20 C.F.R. § 404.1520(a)(4)(ii); see 20 C.F.R. § 404.1509.  The ALJ found that Sauvageau had the following severe impairments:  ADHD, schizoaffective disorder, social anxiety, and mood disorder.  (Tr. 20).  The ALJ determined that Sauvageau's degenerative disc disease, obesity, and neurocognitive disorder were non-severe impairments.  Id.

At the third step, the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or is medically equivalent to one of the listed impairments in Appendix 1 of Subpart P of the Social Security Regulations ("SSRs").  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has an impairment or combination of impairments that meets or is medically equivalent to one of the listed impairments in Appendix 1 and meets the durational requirement, the ALJ will find that they are disabled.  Id.  The ALJ found that Sauvageau did not have an impairment or combination of impairments that met or was medically equivalent to the Appendix 1 impairments.  (Tr. 21).

At the fourth step, the ALJ evaluates the claimant's RFC and their past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  A claimant's RFC must be determined when they have an impairment that is severe but does not meet or medically equal an Appendix 1 impairment.  20 C.F.R. § 404.1520(e).  An individual's RFC is the most that they can do despite their impairments and is based on all relevant evidence from the record.  20 C.F.R. § 404.1545(a)(1).  If the claimant's RFC is such that they can still perform their past relevant work, they are not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  The ALJ found that Sauvageau had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations:

> The claimant must avoid concentrated exposure to extreme heat or cold and avoid concentrated exposure to unprotected heights.  The claimant could attend and focus adequately to perform simple tasks with no fast-paced requirements.  He could tolerate infrequent changes to tasks.  The claimant could not work with the general public.  He occasionally could work with co-workers, but could perform no work in team or tandem.  He could work independently without supervision.

(Tr. 22).  The ALJ determined that these limitations precluded Sauvageau from performing his past relevant work.  (Tr. 28).

At the fifth and final step, the ALJ considers whether the claimant's impairments preclude them from performing other work in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  The

ALJ determined that, based upon his RFC and the testimony of the vocational expert, jobs exist in significant numbers in the national economy that Sauvageau could have performed.  (Tr. 28). Therefore, the ALJ found that Sauvageau was not disabled at any time from his alleged onset date, January 1, 2019, through his date last insured, March 31, 2019.  (Tr. 29).

II.    STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).  The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence. Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003).  Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act.  Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process.  Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This includes

the burden of establishing his RFC.  20 C.F.R. § 404.1512(a).  At step five, the Commissioner has

the burden of identifying specific jobs in the national economy that the plaintiff can perform.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

III.    ANALYSIS

Sauvageau asserts four arguments before the Court.  First, he argues that the ALJ erred in

evaluating his symptoms.  (Docket #8 at 9-12).  Second, Sauvageau argues that the ALJ erred in

her conclusion that Sauvageau did not meet Appendix 1 listings 12.03, 12.04, 12.06, 12.08.  (Id.

at 12-16).  Third, Sauvageau argues that the ALJ erred in her determination of Sauvageau's RFC.

(Id. at 16-18).  Finally, he asserts that there is new evidence that should be analyzed by the ALJ.

(Docket #13 at 1-4).  Each of these arguments will be addressed in turn.

A.    Evaluation of Symptoms

In evaluating the intensity and persistence of Sauvageau's symptoms, the ALJ determined

that his mental impairments were not so severe as to render him unable to work from the alleged

onset date through the date last insured.  (Tr. 22).  In doing so, the ALJ found that Sauvageau's

testimony regarding the severity of his symptoms was exaggerated when compared with the other

evidence in the record.  (See Tr. 23).  Sauvageau asserts that his symptoms remained severe and

argues that the ALJ improperly relied on treatment notes that were based on misrepresentations

Sauvageau made in his attempt to regain custody of his daughter.  (Docket #8 at 10-12).

After the ALJ determines that the claimant has an impairment that could reasonably have

caused the alleged symptoms, she must evaluate the intensity and persistence of the symptoms to

determine how much they limit the claimant's capacity for work.  20 C.F.R. § 404.1529(c)(1).  The

ALJ "examine[s] the entire case record, including the objective medical evidence; an individual's

statements about the intensity, persistence, and limiting effects of symptoms; statements and other

information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017).[7] Factors that are relevant to a claimant's symptoms include daily activities; the location, duration, frequency, and intensity of symptoms; precipitating and aggravating factors; medication, treatment other than medication, and alternative measures taken to relieve symptoms; and other factors concerning functional limitations. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

In evaluating the claimant's statements about his symptoms, the ALJ examines the extent to which the statements are consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4). However, the ALJ may not reject a claimant's statements about his symptoms solely because they are not substantiated by objective medical evidence. 20 C.F.R. § 404.1529(c)(2). Instead, "[i]f the ALJ 'decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so[.]'" Lopez v. Kijakazi, 704 F. Supp. 3d 279, 287 (D. Mass. 2023) (quoting Burge v. Colvin, No. 15-279S, 2016 WL 8138980, at *6 (D.R.I. Dec. 7, 2016)). Such a credibility determination by the ALJ, "who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).

During the final hearing held before the ALJ, Sauvageau testified that he had disabling mental health issues that rendered him unable to work from January 2019 through March 2019. (Tr. 38-75). Sauvageau explained how social anxiety limited his ability to work with others and led to the January 2, 2019 close of his business. (Tr. 52-53). He detailed how he could not leave

---

[7] "SSRs are, by regulation, 'final opinions and orders and statements of policy and interpretations that [the SSA] ha[s] adopted.'" Coskery v. Berryhill, 892 F.3d 1, 4 (1st Cir. 2018) (alteration in original) (quoting 20 C.F.R. § 402.35(b)(1)).

the house alone because of paranoid thoughts. (Tr. 64-67). Sauvageau also stated that he misled Dr. Kennedy following his attempt to remove his new-born daughter from the hospital in order to regain custody from DCF. (Tr. 58-59). Sauvageau identifies deliberate misstatements to Dr. Kennedy as including that he was working and that his plumbing business was doing well, that he was taking his medication and that it was effective, and that he was feeling good. (Id.).

Accordingly, Sauvageau asserts that the ALJ relied on "misrepresentations" and "demonstrably false statements" in arriving at her evaluation of his symptoms. (Docket #8 at 10-11). Sauvageau points to the ALJ's reference to Dr. Kennedy's April 2019 treatment notes, where she found that "his business was doing well, he was busy and was doing very well with his mood and taking his medications correctly." (See Tr. 24). Sauvageau argues that these statements are demonstrably false because of his Federal Tax Returns from 2019 that showed his plumbing business incurred a net loss after business expenses. (Docket #8 at 11; see Tr. 386). Sauvageau also points to Dr. Kennedy's treatment notes from March 2020 reporting that Sauvageau had not been honest about the severity of his poor functioning outside of the home or about taking his prescribed psychosis medication, Lurasidone. (Docket #8 at 10-11; see Tr. 666). However, the ALJ did not rely solely on these statements in arriving at her decision. Instead, she examined the entire record, as SSR 16-3p requires, starting with the period surrounding the birth of Sauvageau's daughter and through the fall of 2020.

In her evaluation, the ALJ started by highlighting the significance of Sauvageau's symptoms before and after the birth of his daughter in September 2018. (Tr. 24). The ALJ found that during his daughter's birth, Sauvageau did not sleep for over twenty-four hours straight and was not taking his antipsychotic medication. (Id.). The ALJ noted that, a week after the incident, Dr. Shiebler wrote a letter to DCF stating that the combination of the birth of his daughter, his

severe lack of sleep, and his failure to take his psychiatric medication combined to cause "a perfect storm for setting [Sauvageau] up for psychosis." (Id.; see Tr. 719).

The ALJ also examined Dr. Kennedy's treatment notes from before and shortly after the incident, which showed "significant abnormalities." (Tr. 24). The ALJ observed that the treatment notes revealed that Sauvageau had difficulty finishing thoughts and explaining himself, was distracted, and could not concentrate for more than a few minutes at once. (Id.; see Tr. 679, 684, 686, 689-91). The ALJ noted that Sauvageau expressed "bizarre spiritual and metaphysical ideas," which Dr. Kennedy categorized as "hallucinations, delusions, and psychotic thought process." (Tr. 24; see Tr. 686). The ALJ also observed that Dr. Shiebler's treatment notes from August and September 2018 report discussions of biblical themes, such as hidden gospels, spiritual connections involving the "Third Eye," and Sauvageau associating distracting and bad thoughts with the "Serpent of Eden." (Tr. 24; see Tr. 703-07).

The ALJ then pointed to significant improvements in Sauvageau's symptoms from medication and psychotherapy as reflected in the treatment notes. (Tr. 24). For example, in December 2018, just before the alleged onset date, treatment notes showed less inner thinking and fewer spiritual distractions following medication. (Id.; see Tr. 678). Sauvageau was "fully coherent, was not making 'bizarre' statements, and demonstrated no significant paranoia." (Id.). The ALJ noted that, as his treatment progressed, Sauvageau was able to do occasional plumbing work, work on home improvement projects, and take care of his daughter. (Tr. 24; see Tr. 663, 670-78).

The ALJ also pointed to Dr. Kennedy's mental status examinations during the period at issue (January 1 through March 31, 2019) and into the fall of 2019, which noted that Sauvageau was "alert and oriented, with appropriate mood and affect, intact associations, organized thought

process, appropriate behavior, normal speech, intact judgment and insight, good attention and concentration, and no delusions, hallucinations, psychosis, or suicidal ideation." (Tr. 24; see Tr. 669-76). Examinations in July 2019 revealed similar results following Sauvageau's reunion with his family. (Tr. 24; see Tr. 670). Dr. Shiebler noted that Sauvageau was "very stable, enjoyed parenthood, and displayed a good sense of humor." (Tr. 24; see Tr. 793).

The ALJ also found that Sauvageau's paranoia symptoms were not evident until July 2019, when he first mentioned his neighbors to Dr. Shiebler. (Tr. 25; see Tr. 699-703, 732-39, 770-72). Even during that visit, Dr. Shiebler did not describe any psychotic thinking. (Tr. 24; see Tr. 732). Dr. Shiebler did not observe worsening paranoia until spring 2020, more than a year after the date last insured. (Tr. 24; see Tr. 793-94). Although the ALJ conceded that Sauvageau's paranoia was at a higher level at this time, she reiterated that it did not occur until over a year after the DLI. (Tr. 25).

The ALJ's evaluation of Sauvageau's symptoms is supported by substantial evidence. The ALJ made a credibility determination that Sauvageau's statements about his symptoms were contrary to the other evidence in the record, pointing to "specific and adequate reasons for doing so." See Lopez, 704 F. Supp. 3d at 287. As such, the ALJ's determination is entitled to deference, and there is no error in her finding that Sauvageau's symptoms were less severe following various treatment options after the birth of his daughter and through the date last insured. See Frustaglia, 829 F.2d at 195.

B.    Consideration of Appendix 1 Listings

The ALJ determined that Sauvageau's impairments did not equal any of the Appendix 1 listings at issue. (Tr. 21). The ALJ concluded that Sauvageau had no more than moderate limitations in each category. (Tr. 21-22). Sauvageau contends that the ALJ "did not accurately

portray the statements of [Sauvageau] and other evidence." (Docket #8 at 12). Specifically, Sauvageau alleges that the ALJ overlooked his and his wife's testimony regarding his limitations when he leaves the security of his home. (See id. at 12-16). As explained below, the ALJ properly reviewed Sauvageau's testimony and other evidence, focusing on the discrepancies between the testimony and Sauvageau's reported activities. (See Tr. 21-22). Although Sauvageau may have been more limited outside the house, the ALJ's determination that he was only moderately limited is supported by substantial evidence.

As part of step three of the sequential evaluation process, the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or is medically equivalent to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant has an impairment or combination of impairments that meets or is medically equivalent to one of the listings and meets the durational requirement, then the claimant is disabled and there is no consideration of the claimant's "age, education, and work experience." 20 C.F.R. § 404.1520(d).

In order to meet the requirements of the relevant Appendix 1 listings, 12.02, 12.03, 12.04, 12.06, and 12.08, the claimant's mental impairments must result in extreme limitation of one, or marked limitation of two, of the four areas of mental functioning as outlined below. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, §§ 12.02(B), 12.03(B), 12.04(B), 12.06(B), 12.08(B). Limitations to an area of functioning are considered "extreme" when there is no ability to function "independently, appropriately, effectively, and on a sustained basis," id. § 12.00(F)(2)(e), and are considered "marked" when the ability to function "independently, appropriately, effectively, and on a sustained basis is seriously limited," id. § 12.00(F)(2)(d).

In the first area of mental functioning -- understanding, remembering, or applying information -- the ALJ found only mild limitations. (Tr. 21). The ALJ acknowledged Sauvageau's claims that he had general memory problems and difficulty with following directions, completing tasks, and attending appointments in the absence of reminders. (Id.; see Tr. 38-75, 474-82). However, the ALJ contrasted these difficulties with Sauvageau's testimony and his function report that he submitted to the SSA in June 2020, where he noted that he could "perform maintenance, prepare meals, go to doctor's appointments, take medications, use a checkbook, drive, and read." (Tr. 21; see Tr. 38-75, 474-82). The ALJ also found that Sauvageau was able to provide information about his health and prior work history, follow his doctor's instructions, comply with outside treatment, and answer questions from healthcare providers. (Tr. 21; see Tr. 566-659, 662-93). Finally, the ALJ drew attention to the scarcity of evidence in the record that Sauvageau had any memory issues. (Tr. 21; see, e.g., Tr. 566-659, 662-93).

In the second area of functioning, interacting with others, the ALJ determined that Sauvageau had moderate limitations. (Tr. 21). While the ALJ acknowledged Sauvageau's allegations that he had difficulty interacting with others, dealing with authority figures, and engaging in social activities, (id.; see, e.g., Tr. 475, 480); the ALJ noted that Sauvageau's own statements revealed he was able to go shopping and spend time and live with his family, (Tr. 21; see Tr. 38-75, 474-82). The ALJ also pointed to the medical evidence that showed Sauvageau was pleasant and friendly with healthcare providers and "appeared comfortable" during appointments. (Tr. 21, see, e.g., Tr. 617-58).

In the third area, concentrating, persisting, or maintaining pace, the ALJ found moderate limitations. (Tr. 22). The ALJ again contrasted Sauvageau's allegations with his reported activities. (Id.). The ALJ noted that, although Sauvageau claimed difficulty with "concentrating

and maintaining focus, following instructions, and completing tasks," he also reported he was able to drive, prepare food, count money, read, and manage his medical affairs.  (Id.; see Tr. 38-75, 474-82).  The ALJ also observed that the record showed little mention of distractibility or an inability to complete concentration assessments.  (Tr. 21; see, e.g., Tr. 561-65, 662-93).

In the fourth and final area, the ability to adapt or manage oneself, the ALJ determined that Sauvageau had moderate limitations.  (Tr. 22).  Sauvageau claimed that he had trouble with stress and mood management, (id.: see, e.g., Tr. 480); however, he also offered that he was able to tend to his own self-care and personal hygiene, as well as the care of his infant daughter, his mother-and-law, and his cat, (Tr. 22; see Tr. 38-75, 474-82).  Furthermore, the objective record evidence showed that Sauvageau had proper hygiene and grooming, no problems getting along with healthcare providers, and normal mood and temper control.  (Tr. 22; see, e.g., Tr. 648, 669-76).

Sauvageau argues that the ALJ erred in her portrayal of his statements and the objective evidence by finding that Sauvageau could "perform maintenance."  (Docket #8 at 12).  Sauvageau points to his function report to the SSA where he stated that he could do yardwork "as long as all the neighbors are inside their houses" and that he needs to talk himself into doing the work. (Tr. 476).  However, this report was from more than a year after the disability period at issue.  The objective evidence does not show that Sauvageau had these limitations January through March 2019.  For instance, in April 2019, Dr. Kennedy noted that Sauvageau had been "doing a lot of yard work" without any mention of limitations.  (Tr. 672).  Even a year later, in May 2020, Dr. Kennedy's treatment notes revealed Sauvageau was getting a sore back from yardwork.  (Tr. 664).  Furthermore, in June 2020, treatment notes showed Sauvageau was busy with yardwork and was working on a play area for his daughter.  (Tr. 663).

Sauvageau also argues that the ALJ did not accurately interpret his ability to shop and prepare meals, citing the infrequency that he went to the store and the simplicity of the meals he prepared.  (Docket #8 at 13-14).  These statements were again from the June 2020 report to the SSA, which was a year after the date last insured.  (Tr. 476-77).  Even if Sauvageau's paranoia did cause more than moderate limitations, which is not supported by the record, it did not occur until at least a year after the last date insured.

Sauvageau alleges that the ALJ erred in finding that "the record shows little mention of distractibility."  (Docket #8 at 14).  Although Dr. Kennedy did assess Sauvageau as having extreme limitations in maintaining attention and concentration for extended periods, (Tr. 750), the ALJ found that this assessment was inconsistent with Dr. Kennedy's treatment notes from and around the period at issue.  (Tr. 26; see Tr. 669-78).  Sauvageau also points to Dr. Shiebler's assessment which asserted marked limitations in his ability to maintain attention and concentration for extended periods as well as his ability to work with others without being distracted by them. (Docket #8 at 14-15; see Tr. 754-55).  Once again, this assessment was contrary to Dr. Kennedy's treatment notes.  (See Tr. 669-78).  Both Dr. Kennedy and Dr. Shiebler noted improvements with medication following the birth of Sauvageau's daughter and into fall 2019.  (See, e.g., Tr. 668-69, 683-84, 717-18, 736).  Furthermore, both doctors noted only moderate limitations with the ability to carry out simple instructions.  (Tr. 750, 754).

Finally, Sauvageau alleges that the ALJ erred in her determination that he had only moderate limitations in his ability to adapt and manage himself.  (Docket #8 at 15-16).  However, Sauvageau relies on his and his wife's testimony about his difficulties which the ALJ factored into her determination.  (Id.; Tr. 26-27).  To the extent any medical evidence supported Sauvageau's testimony, the medical evidence was not from the period at issue.

Although Sauvageau testified to his difficulties in the four mental functional areas, the ALJ found that his reported activities along with the medical and other evidence showed no more than moderate limitations.  In doing so, the ALJ clearly articulated which listings she examined, and provided "more than a perfunctory analysis of [each] listing."  See Stratton v. Astrue, 987 F. Supp. 2d 135, 145 (D.N.H. 2012) (quoting Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004)). Accordingly, the ALJ's determination that Sauvageau's impairments did not meet the Appendix 1 listings at issue is supported by substantial evidence.

C.    Determination of RFC

The ALJ found that Sauvageau had the RFC to perform a full range of work with non-exertional limitations.  (Tr. 22).  These limitations included Sauvageau sticking to simple tasks with no fast-paced requirements, occasional changes to tasks, no work with the public, and occasional work with co-workers.  (Id.).  In making this RFC assessment, the ALJ found the opinions of the two state agency psychological consultants and the first assessment from Dr. Kennedy to be partially persuasive.  (Tr. 25-26).  Sauvageau alleges that the ALJ erred in her RFC determination by failing to appropriately consider his and his wife's testimony regarding his difficulty working with others and his fear of leaving his house alone.  (Docket #8 at 16-17). However, the ALJ took these concerns into consideration as well as the submitted medical opinions when determining Sauvageau's limitations, which are supported by substantial evidence.  (See Tr. 22-28).

In arriving at her RFC determination, the ALJ evaluated the various medical opinions in the record.  (Tr. 25-27).  In considering medical opinions, specific evidentiary weight is no longer given to a claimant's treating physician.  See 20 C.F.R. § 404.1520c(a); Pickhover v. Kijakazi, 594 F. Supp. 3d 299, 311 (D. Mass. 2022) ("the law in this circuit does not require ALJs to give greater

weight to the opinions of treating physicians" (quoting <u>Hughes v. Colvin</u>, No. 12-11576-DJC, 2014 WL 1334170, at *8 (D. Mass. Mar. 28, 2014))).  Instead, medical opinions are evaluated based on a set of factors that include, among others, the physician's relationship with the claimant, the supportability of the opinion, the consistency of the opinion with the rest of the case record, and whether the opinion is given by a specialist.  20 C.F.R. § 404.1520c(c).  The most important factors are supportability and consistency.  20 C.F.R. § 404.1520c(b)(2).

The ALJ found the state agency psychological consultants' assessments partially persuasive.  (Tr. 25).  The consultants found that Sauvageau's mental impairments caused mild to moderate limitations in the four functional capacity categories, opining that Sauvageau had the capacity to complete routine tasks with minimal social demands and not more than simple changes.  (Tr. 96-99, 107-10).  The ALJ found that these assessments were substantiated by citations to the record and were consistent with the medical evidence –

> showing improved function with treatment, with observations showing the claimant to be alert and oriented, pleasant, and appropriately groomed and dressed, with normal thought process, intact associations, normal speech, appropriate mood and affect, intact judgment, good attention and concentration, and no delusions, paranoia, psychosis, or suicidal ideation.

(Tr. 25; <u>see</u>, <u>e.g.</u>, Tr. 617-58, 669-76, 678).  However, the ALJ determined the assessment of "minimal social demands" to be an "overbroad" characterization and not adequately stated in work-related terms.  (Tr. 25-26).  Therefore, the ALJ provided clearer limitations such as not working with the public and occasionally working with co-workers but not as part of a team.  (<u>See</u> Tr. 22, 26).

The ALJ found the first assessment by Dr. Kennedy to also be partially persuasive.  (Tr. 26).  Dr. Kennedy stated that Sauvageau was dealing with "flares of disorganized thoughts and paranoia" but that medication ameliorated these symptoms.  (<u>Id.</u>; <u>see</u> Tr. 695-97).  While the ALJ

noted that this statement was generally consistent with the medical evidence, she highlighted that "there is no indication that Dr. Kennedy limited his analysis to January through March 2019." (Tr. 26). The ALJ then explained that it was not until late 2019 that Sauvageau wanted to retire from plumbing work and that he continued to take jobs after his daughter was born. (Id.; see Tr. 669-74). The ALJ accepted Dr. Kennedy's opinion that Sauvageau did not take criticism well, which she factored into his RFC by "limiting [his] interaction with co-workers and the public." (Tr. 26; see Tr. 696).

The ALJ found Dr. Kennedy's second assessment to be "wholly unpersuasive." (Tr. 26). Dr. Kennedy found that Sauvageau had marked to extreme limitations in the functional capacity areas. (Tr. 750-52). He also opined that Sauvageau would be absent twenty-nine out of thirty days in a month and would be off task 20% of the time. (Tr. 752). The ALJ stressed that this opinion was unsubstantiated and inconsistent with Dr. Kennedy's treatment notes from late 2018 through fall 2019. (Tr. 26). The ALJ also found this assessment to be at odds with Sauvageau's reported activities in 2018 and 2019, which included plumbing jobs, meeting DCF and family court requirements, caring for his daughter and mother-in-law, and doing yard work. (Tr. 26-27; see, e.g., Tr. 62, 669-74).

Finally, the ALJ reviewed Dr. Shiebler's medical source statement submitted in December 2020. (Tr. 27). Dr. Shiebler's statement opined that Sauvageau had marked limitations in functional capacity areas and noted that Sauvageau's condition deteriorated after the birth of his daughter. (Tr. 27; see Tr. 793). The ALJ found this opinion to be unpersuasive as it was not supported by Dr. Shiebler's treatment notes, which were "unfortunately largely indecipherable," and inconsistent with the rest of the medical evidence. (Tr. 27). The ALJ drew attention to the status examinations from Dr. Kennedy that showed improvement with medication after the

incident with Sauvageau's daughter through the March 31, 2019 DLI.  (Tr. 27; see Tr. 673-81).

The ALJ also pointed to records from Dr. Shiebler and Dr. Kennedy that showed that Sauvageau

may not have been taking his medication during the period of heighted paranoia after the date last

insured.  (Tr. 27; see Tr. 666, 700, 744).

In support of his argument that the ALJ erred in her RFC determination, Sauvageau

provides only his subjective testimony and the testimony of his wife.  (Docket #8 at 16-17).  He

does not point to any other evidence showing that he did not have the functional capacity to

perform the work that the ALJ presented.  (See id. at 16-18).  Instead, Sauvageau asks the Court

to resolve a conflict in the evidence between his testimony and the other evidence in the record.

However, this resolution was already made by the ALJ, and it is reserved for the ALJ alone.  See

Seavey, 276 F.3d at 10.

Furthermore, the ALJ's resolution is supported by "the relevant medical and other

evidence" in the record, in accordance with 20 C.F.R. § 404.1545(a)(3).  The ALJ considered all

the submitted medical opinions and weighed them according to their supportability and

consistency with the rest of the record.  (Tr. 25-28).  Although Sauvageau testified to being

extremely limited outside of the house, he was still able to take plumbing jobs through the period

at issue and into fall 2019.  See Akers v. Astrue, No. 08-cv-30186-KPN, 2009 WL 2490112, at *5

(D. Mass. July 31, 2009) ("it is well within an [ALJ]'s power to consider work that a claimant has

done even if such work itself is not considered substantial gainful activity" (citing 20 C.F.R.

§ 404.1571)).  Sauvageau's ability to still perform plumbing work, take care of his daughter, and

his failure to properly take his medication support the ALJ's inference that Sauvageau may not

have been as limited as he claims.  See Coskery v. Berryhill, 892 F.3d 1, 6-7 (1st Cir. 2018) ("SSR

16-3p expressly provides that an ALJ must 'consider an individual's attempts . . . to follow

treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities" (quoting SSR 16-3p, 2017 WL 5180304, at *9)). Therefore, the ALJ supportably found that Sauvageau was still able to perform work with the prescribed limitations.

D.    New Evidence

Sauvageau seeks to remand to the ALJ to consider new evidence in the form of an affidavit from his current primary care physician who was previously Sauvageau's wife's supervisor from 2018 through 2021.  (Dockets #13; 13-1).  To justify remand to the ALJ to hear new evidence, the claimant must show that the evidence is both new and material and that there is good cause for failing to introduce it in earlier proceedings.  42 U.S.C. § 405(g); Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139 (1st Cir. 1987).  The evidence is deemed material if it could have reasonably resulted in a different decision from the Commissioner.  Falu v. Sec'y of Health & Human Servs., 703 F.2d 24, 27 (1st Cir. 1983).  Remand for new evidence is appropriate only when the evidence is "necessary to develop the facts of the case fully," "not cumulative," and "essential to a fair hearing."  Evangelista, 826 F.2d at 139.  The good cause requirement may be met if the evidence was unavailable to the claimant at the time of the prior proceedings.  See Bilodeau v. Shalala, 856 F. Supp. 18, 20-21 (D. Mass. 1994).  The claimant bears the burden of proving the materiality of the evidence and the good cause for the failure to introduce it at earlier proceedings.  Rawls v. Apfel, 998 F. Supp. 70, 75 (D. Mass. 1998) (citing Evangelista, 826 F.2d at 139).

Evidence can hardly be said to be "necessary to develop the facts of the case fully" or "essential to a fair hearing," when the ALJ has already heard ample evidence that covers multiple years and an "array of ailments."  Evangelista, 826 F.2d at 139-40.  Similarly, evidence is not new

just because it comes from a different source; the evidence must not reiterate what is already part of the record.  See id.  Sauvageau has a steep hurdle to overcome, as the ALJ already examined years of medical records, treatment notes, statements from medical professionals, and testimony from Sauvageau himself.

In the context of this standard, Sauvageau seeks to introduce an affidavit from Dr. Cheryl Divito dated January 9, 2025, and thus, nearly six years after the time period at issue.  (Docket #13-1).  Dr. Divito has been Sauvageau's primary care physician for more than a year.  (Id.).  Previously, she was the supervising physician of Ms. Sauvageau, who is a registered nurse, from January 2018 through April 2021.  (Id.).  Sauvageau alleges that Dr. Divito has knowledge about Sauvageau's condition during the relevant alleged disability period which she acquired during her interactions with Sauvageau and frequent conversations with his wife.  (Dockets #13 at 3; 13-1).  In her affidavit, Dr. Divito opines that Sauvageau's impairments rendered him unable to work following the birth of his daughter in September 2018 through March 31, 2019.  (Docket #13-1).

Sauvageau's attempt to remand for consideration of new evidence fails both the novelty and the materiality requirements of 42 U.S.C. § 405(g).  Sauvageau argues that Dr. Divito's evidence is new and not cumulative because the communications and interactions forming the basis of her opinion were made "without the motive of trying to show Mr. Sauvageau in a positive light for the purpose of gaining custody of his child."  (Docket #13 at 3).  Sauvageau contrasts this with his interactions with Dr. Kennedy and Dr. Shiebler in which he alleges he intentionally mislead them about his condition to regain custody of his daughter.  (Id. at 2-3).  However, regardless of Sauvageau's motivations, Dr. Divito's affidavit is cumulative of Sauvageau's testimony.  Dr. Divito alleges in her affidavit that Sauvageau was unable to work during the period at issue (Docket #13-1), which was echoed by Sauvageau in the final hearing before the ALJ.  (See,

e.g., Tr. 53).   The ALJ had already supportably rejected similar testimony by Sauvageau as inconsistent with the medical record during and around the period at issue. (Tr. 23-28).

While Sauvageau alleges that Dr. Divito's evidence is different because of her status as a physician, (Docket #13 at 3), she was not his treating physician during the relevant time period, (see Docket #13-1).  Her evidence is essentially the same as Ms. Sauvageau's testimony, which was incorporated into the ALJ's decision even though it was not in the administrative record.  (Tr. 23).   The ALJ explained that she "considered [Ms. Sauvageau's testimony] as supporting Sauvageau's allegations.   (Id.).   Therefore, Dr. Divito's evidence is cumulative of not only Sauvageau's testimony but also his wife's.

Dr. Divito's evidence is also not material.  The affidavit is not a medical opinion; Dr. Divito does not describe what Sauvageau can still do despite his impairments or identify any impairment-related restrictions in work activities.   See Tuttle v. Saul, No. 3:20-cv-30064-KAR, 2021 WL 2018990, at *18 (D. Mass. May 20, 2021) ("Again, the doctor did not opine on the impact that the functional limitations of Plaintiff's left hand would have on his ability to perform sustained work-related activities, so the statement was not a 'medical opinion' for purposes of assessing the severity of Plaintiff's impairment or determining the RFC.").   Instead, Dr. Divito's statements about whether Sauvageau is "able to work [] or able to perform regular or continuing work" are statements on an issue reserved to the Commissioner and thus evidence that is "inherently neither valuable nor persuasive" and requires no analysis by the ALJ.  20 C.F.R. § 404.1520b(c)(3)(i); see Philbrook v. Colvin, No. 1:14-cv-10766-LTS, 2015 WL 2376129, at *3 (D. Mass. May 19, 2015) ("[Claimant's] mental health doctors' opinion that her disability 'grossly interferes with her ability to do any type of work' is a conclusion of law instead of medical opinions about [claimant's] condition and its effects.  Thus, the Appeals Council did not err in finding that this opinion would

not have changed the outcome of the decision."). Hence, the undersigned finds that the introduction of Dr. Divito's opinion would not reasonably result in a different decision by the ALJ and hence there is no need for remand. See Falu, 703 F.2d at 27.

IV.    CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that Sauvageau's Motion to Remand (Docket #12) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket #10) be ALLOWED. [8]

/ s / David H. Hennessy
David H. Hennessy
United States Magistrate Judge

---

[8] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).